1
2
3
4
5
6
7
8       **IN THE UNITED STATES DISTRICT COURT**

9       **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    JEFFREY KILGORE,                              No. CIV S-07-0834-CMK

12                    Plaintiff,

13           vs.                                          <u>MEMORANDUM OPINION AND ORDER</u>

14    COMMISSIONER OF SOCIAL
        SECURITY,
15
                        Defendant.
16    _____/

17                    Plaintiff, who is proceeding with retained counsel, brings this action for judicial

18    review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

19    Pursuant to the consent of the parties, this case is before the undersigned for final decision on

20    plaintiff's motion for summary judgment (Doc. 13) and defendant's cross-motion for summary

21    judgment (Doc. 16).

22                                          **I.  PROCEDURAL HISTORY**

23                    Plaintiff applied for social security benefits on July 29, 2004.  In his application,

24    plaintiff claims that his disability began on January 26, 2001.  In an adult disability report

25    submitted with his application, plaintiff claims his disability consists of a combination of

26    degenerative disc disease, right forearm laceration and nerve damage, and pain.  Plaintiff's claim

                                                            1

was initially denied.  Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on October 13, 2005, before Administrative Law Judge ("ALJ") Theodore T. N. Slocum.  In his April 19, 2006, decision, the ALJ made the following findings:

1. The claimant met the disability insured status requirements of the Act on January 26, 2001, the date the claimant stated he became unable to work, and continues to meet them through the end of December 2003.

2. The claimant has not engaged in substantial gainful activity since January 26, 2001.

3. Beginning on or before the end of December 2003, the medical evidence establishes that the claimant had "severe" back pain and right upper extremity soft tissue injury, but that he has not had an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.  There is no evidence in the record that the claimant has any migraine headaches and this impairment is therefore deemed to be non-severe.

4. The claimant's testimony is not substantially credible for the reasons stated in the body of this decision.

5. Beginning on or before the end of December 2003, the claimant has had the residual functional capacity to perform the physical exertion and nonexertional requirements of work except for frequently lifting more than 10 pounds, occasionally lifting more than 20 pounds, and repetitively stooping or bending (20 CFR § 404.1545).

6. Beginning on or before the end of December 2003, the claimant has been unable to perform his past relevant work as a warehouse manager, delivery driver, cellular tower warehouse worker and carpenter.

7. Beginning on or before the end of December 2003, the claimant's residual functional capacity for the full range of light work has been reduced by bending and stooping restrictions.

8. The claimant is 44 years old, which is defined as a younger age individual (20 CFR § 404.1563).

9. The claimant possesses the equivalent of a high school education (20 CFR § 404.1564).

10. The claimant does not have any acquired work skills which are transferable to the skilled or semi skilled work functions of other work (20 CFR § 404.1568).

/ / /

11.     With respect to the period beginning on or before the end of December 2003, it is held that based on an exertional capacity for light work, and considering the claimant's age, education, and work experience, section 404.1569 and Rule 202.22, Table No. 2, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12.     For the period beginning on or before the end of December 2003, the claimant's capacity for light work has not been compromised by his nonexertional limitations.  Accordingly, using the above-cited rule(s) as a framework for decision making, the claimant is not disabled.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

After the Appeals Council declined review on March 23, 2007, this appeal followed.


## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following medical records:

1.     Medical Report dated June 30, 2000, from Michael Millman, Ph.D. (CAR 215-19);

2.     Medical Report dated September 1, 2000, from Gisler Family Chiropractic (CAR 220-24);

3.     Medical Report dated October 25, 2000, from Edington Medical Group (CAR 225-32);

4.     Medical Records covering the period from March 2, 2000 to December 26, 2001, from Med Clinic (CAR 233-39);

5.     Medical Report dated March 20, 2002, from Santiam Chiropractic Clinic (CAR 240-43);

6.     Medical Report dated August 6, 2002, from Todd J. Lewis, M.D. (CAR 244-45);

7.     Residual Functional Capacity Assessment -Physical (DDS) dated December 3, 2002 (CAR 246-50);

8.     Psychiatric Review Technique Form (DDS) dated December 4, 2002 (CAR 251);

9.     Medical Records covering the period from June 20, 2002 to February 27, 2003, from Park Street Clinic (CAR 252-59);

10.    Medical Report dated March 4, 2003, from Department of Veteran's Affairs  (CAR 260-96);

11.    Medical Report dated October 25, 2004, from Rita B. Bermudez, M.D. (CAR 300-05);

12.    Psychiatric Review Technique Form (DDS) dated November 23, 2004 (CAR 306);

13.    Residual Functional Capacity Assessment - Physical (DDS) dated January 11, 2005 (CAR 311-18);

14.    Medical Records covering the period from July 2, 2004 to October 10, 2005, from Department of Veteran's Affairs (CAR 319-38); and

15.    Medical Records covering the period from August 16, 2006 to October 24, 2006, from Department of Veteran's Affairs (CAR 339-45).

Treating Physician Reports:

2000

Plaintiff was seen on March 2, 2000, by Dr. Thom at MedClinic for attention deficit disorder, requesting a change in his medication from Ritalin to Adderall.  Dr. Thom noted plaintiff had surgery on his right forearm, but insofar as plaintiff's request to change his medication, Dr. Thom wanted the assistance of plaintiff's psychologist and pharmacist regarding the proper use of the Adderall.

Plaintiff was assessed by Michael Millman, Ph.D. on June 30, 2000.  Dr. Millman found plaintiff tested positive for ADHD, inattentive type.  He suggested a trial of Adderall, then retesting plaintiff on the medication for comparison.

On August 4, 2000, plaintiff saw Dr. Thom again following his evaluation by Dr. Millman.  Dr. Thom's assessment included attention deficit hyperactivity disorder, inattentive type, and driver's physical exam.  Dr. Thom prescribed Motrin and Adderall, stating plaintiff was to be rechecked in six weeks.

On September 1, 2000, plaintiff's chiropractor, J. Charles Gisler D.C., wrote a report to Dr. Thom regarding plaintiff's condition.  Dr. Gisler reviewed plaintiff's back injury and chronic low back pain and stiffness which "completely incapacitates him."  (CAR 220).  At

the time of Dr. Gisler's report, plaintiff was working as a window installer and frequently worked

in pain.  Dr. Gisler noted that when the pain become severe, plaintiff took Motrin for relief and

sought chiropractic care.   Plaintiff had been examined at Dr. Gisler's clinic on May 25, 2000, for

the purpose of compiling information for a ratable report relating to his back injuries.  Dr.

Gisler's examination findings from the May 25, 2000, exam included the following:

> examination of the lumbar spine showed severe limitation of
> motion in all directions.  Flexion measured 30/95 degrees,
> Extension measured 15-35, left lateral flexion 20/40, right lateral
> flexion 20/40, Left rotation was 15/35 and right rotation was 20/35
> degrees respectively.
> Orthopedic testing of the lumbar spine showed several
> positive tests including nerve root irritation of the lumbar plexus.
> Iliac Compression, Yeoman's were positive bilaterally.  Straight
> Leg Raise was positive at 40 degrees both sides.  Braggard's was
> positive at 35 degrees both sides.  Val Salva test was positive
> indicating vertebral disc injury.  Kemp's test was positive
> bilaterally.
> Nerve root evaluation of the lumbar spine showed moderate
> weakness against resistance measuring +3/5 at levels T12-S1
> bilaterally.  Deep tendon reflexes were diminished, measuring +1/2
> at levels L2-L4 and S1 bilaterally.
> Soft tissue evaluation showed remarkable myospasm and
> tenderness at levels L1-S1 bilaterally.

(CAR at 221).

Dr. Gisler also noted that x-rays were obtained of plaintiff's lumbar spine on

February 24, 2000, which showed: hyperlordosis moderate facet arthrosis at levels L3-L5; facet

imbrication evident at levels L2-L5; the L5-S1 disc angle measured 22 degrees indicating acute

posterior wedging; and multiple subluxation at levels L2-S1.  Dr. Gisler diagnosed plaintiff with

chronic, traumatic lumbar syndrome with associated subluxation and disc injury.  Plaintiff

reported to Dr. Gisler that he suffers extreme flare-ups five to ten times per year which last

approximately one week.

Dr. Gisler opined plaintiff has the following work restrictions: no sitting for one

hour or longer; no standing for one hour or longer; no lifting over 40 pounds above the waist; no

lifting over 30 pounds above the shoulder level; no lifting over 50 pounds to any level; no lifting

requiring twisting of the trunk; no carrying of objects over 40 pounds for more than 20 feet or

more than one-minute; no frequent stooping or squatting; no frequent twisting or bending at the waist; no frequent tasks which require awkward body positioning; no frequent pushing, pulling, or turning which involves the lowback.  Given these restrictions, Dr. Gisler opined that plaintiff is capable of performing his duties as a window installer, although noting that discomfort was likely.

On September 11, 2000, plaintiff saw Dr. Thom again as a followup to his attention deficit disorder and refill of his Adderall.  Plaintiff was to follow up in two months time.

Plaintiff followed up with Dr. Nguyen at MedClinic, as Dr. Thom had suggested, on November 22, 2000.  Plaintiff reported periods of inattention and inability to complete tasks.  Dr. Nguyen noted plaintiff's only medication was Adderall.  Plaintiff appeared to be in no acute distress.  Dr. Nguyen refilled plaintiff's Adderall and suggested a follow-up in two months and physical examinations on a yearly basis.

<u>2001</u>

Plaintiff did not see Dr. Nguyen at MedClinic again until May 24, 2001.  Plaintiff reported back pain and requested marijuana and Vicodin.  Dr. Nguyen noted that plaintiff had been evaluated by his chiropractor (plaintiff had his evaluation in hand), and a spine specialist at McClellan a month ago (that report was still pending).  Plaintiff reported taking ibuprofen which resolved his back pain generally, and Vicodin intermittently when the pain was intolerable.  Dr. Nguyen noted plaintiff was generally comfortable, his back had full range of motion, with only slight tenderness in the lumbosacral area, and no motor or sensory deficit.  Dr. Nguyen gave plaintiff a prescription for Vicodin for possible back strain, but denied him marijuana.

On December 26, 2001, plaintiff saw Dr. Nguyen again for a follow up on his ADHD and back pain.  Plaintiff's prescriptions for Adderall, Motrin and Vicodin were refilled.

/ / /

/ / /

<u>2002</u>

On July 26, 2002, plaintiff's chiropractor wrote a report to the Department of

Human Services.  Dr. Lynch reported that plaintiff had been seen and treated on March 20, 2002

for his lower back condition.  On examination, plaintiff had

> moderate to severe decrease in lumbar range of motion with
> increased pain in each direction; on palpation there were
> hypertonic muscles bilaterally in the lumbar area.  Deeper
> palpation located trigger points and subluxated vertebrae (ie: Right
> iliac bone, L-5 and L-2).  Positive orthopedic tests were kemps,
> valsalva, nachlas, bilateral leg raise, and patrick faberes.  The
> achilles refer was diminished bilaterally.

(CAR at 240).

Dr. Lynch diagnosed plaintiff with chronic reoccurring lumbo-sacral sprain with

associated myositis and subluxation complex, and lumbar facet syndrome.  However, he stated

an MRI of plaintiff's lower back was needed to rule out a lumbar disc herniation.  Dr. Lynch

opined that based on plaintiff's report of pain, that his work possibilities were limited, but did not

indicate any specific restrictions.

Plaintiff was seen by nurse practitioner Maria Clark Harmon at the Park Street

Clinic, on July 1, 2002, for chronic back pain.  Plaintiff's medications included ibuprofen,

Vicodin and Adderall.  He reported he exercised by doing housework.  Ms. Harmon referred

plaintiff to Dr. Lewis for assessment of his back and to LCMH for his ADHD.[1]

On August 6, 2002, plaintiff saw Dr. Lewis, on a referral, for his back pain.

Plaintiff reported numbness into the right side in an L5 distribution particularly; sitting is worse

than standing; and he takes Motrin regularly and Vicodin occasionally for severe pain.  On

examination,  Dr. Lewis found plaintiff was

> tender in both parajunctional regions at the lumbosacral junction,
> left greater than right; slightly tender in the left sciatic notch.
> Dorsolumbar flexion is 25 degrees; extension is zero degrees.  Side
> bending is 8 degrees to the right, 10 degrees to the left.  He can

---

[1]      The court notes there are no medical records provided from LCMH.

1   ambulate on his heels and toes.  Figure-of-four position is negative
    bilaterally.  Straight-leg raise is negative to 70 degrees bilaterally.
2   Neurovascular status reveals diminished right L5 sensation and
    slight diminished right S1 sensation as compared to the left.
3   (CAR at 244).

4        Dr. Lewis also found plaintiff's low back x-rays were benign.  Dr. Lewis opined

5   that plaintiff can function to some degree, but should be on long-term anti-inflammatories and a

6   good conditioning exercise program for his back.  He noted that the occasional use of

7   medications such as hydrocodone would not be inappropriate.

8        On August 29, 2002, plaintiff saw Ms. Harmon for a follow-up regarding his

9   ADHD and back pain.  Plaintiff reported he had been using Vicodin approximately one a day for

10  the past two years, and ibuprofen two to three times a day.  Ms. Harmon noted plaintiff was in no

11  acute distress and with the exception of his back pain and ADHD, he reported generally feeling

12  well.  Her examination found tenderness in plaintiff's lumbosacral spine, more so on the left than

13  the right, and on palpation of the left sciatic notch.  Plaintiff was able to heel and toe walk, his

14  straight leg raises were negative, and he had some decrease in sensation in the right L5.

15  Plaintiff's prescription for Adderall was refilled, and he was educated regarding long term use of

16  narcotic medications.

17       Plaintiff saw Ms. Harmon again on September 16, 2002, regarding his narcotic

18  pain management treatment.  Plaintiff reported using a TENS unit, which apparently was not

19  helpful, and noted having had physical therapy in the past.  Plaintiff was to return every six

20  weeks for reevaluation.

21       On November 8, 2002, plaintiff returned to the clinic with increased back pain,

22  seeking a new referral to Dr. Lewis.  Plaintiff reported the Vicodin was no longer as effective as

23  it was before, and was causing some headaches.  He also wanted to switch his ADHD

24  medication.  Plaintiff's medication was switched from Vicodin to Percocet, but was told to

25  follow up at LCMH before changing his ADHD medication.

26  / / /

<u>2003</u>

Plaintiff was seen by Dr. Forrester at Park Street Clinic on January 7, 2003, for a refill on his Vicodin. Plaintiff reported aggravating his back by being more active than usual, requiring the use of more Vicodin than normal. He also reported the Percocet he tried was not as helpful for pain control as the Vicodin and had discontinued its use at that time. Dr. Forrester increased plaintiff's Vicodin prescription from 30 tablets for the month to 45.

On March 4, 2003, plaintiff had a lumbar sacral spine x-ray. This showed a mild disk space narrowing at L4-5 and L5-S1. The impression was mild degenerative disk disease at L4-5 and L5-S1. Plaintiff was also examined by Doyle W. Kelley, PAC, at the Department of Veteran's Affairs (VA). Mr. Kelley found plaintiff to be in no acute distress, and no exquisite lumbar tenderness to percussion. Plaintiff had a range of motion of "60 degrees of forward flexion, 0 degrees hyperextension due to pain, lateral bending 15 degrees with pain at that endpoint in both directions, and rotation 15 degrees in both directions with pain at that endpoint." (CAR at 273). Plaintiff was able to stand on his heels and toes, but with moderate difficulty. His deep tendon reflexes were equal at the knees and the ankles, his motor strength at the quadriceps and tibial group were 5/5 on the left, 4/5 on the right, he had diminished sensation across three toes on their right foot, but no measurable atrophy. Mr. Kelley's diagnosis was degenerative disc disease, lumbar spine, with right lower extremity radiculopathy and chronic pain syndrome. It was expected that during one of plaintiff's flare-ups of pain, he would have additional motion loss of 15 to 20 degrees in forward flexion and moderately severe alteration in his gait and endurance as well as moderate muscular lumbar weakness and spasm. In a summary consigned by Dr. Matson, Mr. Kelley opined that

> [i]n terms of employability, [plaintiff] would not be suitable in jobs requiring long periods of sitting or standing, heavy lifting, bending, or stooping. He would only qualify for sedentary work. His problem is chronic and not expected to improve.

(CAR at 274).

On April 22, 2003, plaintiff saw Dr. Dattilo at the VA, to establish care and refill

of his medications.  His medications were noted to be ibuprofen, Vicodin and Adderall, and it

was noted that he does not have a regular exercise program nor has he ever done physical

therapy.  It was also noted that he was slightly overweight, and in no acute distress.  He had

negative straight leg raises, was able to move easily up and down off the examination table, and

had no muscle wasting.  Dr. Dattilo noted no evidence of complete inability to pursue

employment, but that plaintiff needed further evaluation including MRI.  Dr. Dattilo refilled

plaintiff's ibuprofen and Vicodin, but because plaintiff was relocating was unable to help with

his ADHD medications.

<u>2004</u>

On November 2, 2004, plaintiff was seen by Dr. Metts for his back pain, and refill

of his prescriptions.  His medications were noted as ibuprofen and methocarbamol.  Plaintiff

reported his pain is getting worse over time.  He said he had pain in bending over, walking,

sitting and standing, but it was not bad when he was laying down.  He rated his pain at 4 to 6 on

average and as mild.  He did have periodic flare ups, which would last for two to three weeks.

On examination, plaintiff's heal and toe walk were intact, he was able to stoop down slowly,

straight leg raises in a sitting position bilaterally, straight leg raises in supine position on the right

was at 45 degrees and positive on the left at 55 degrees.  He had decreased sensation to the touch

on his left leg.  Plaintiff was prescribed Percocet, and was to have a CT scan.

On December 21, 2004, plaintiff had an MRI spine lumbar without contrast.  The

radiology report indicates:

> At the L3-L4 level, a mild diffuse disc bulge fails to cause
> significant acquired canal stenosis and the neural foramina remain
> patent bilaterally.
> At the L4-L5 level, a moderate focal disc bulge is slightly acentric
> to the right side and causes mass effect on the anterior aspect of the
> thecal sac.  The neural foramina remain patent bilaterally.

(CAR at 327).

The impression was "[f]ocal disc bulge slightly to the right at L5-S1.  Detailed

neurologic exam would help place this finding in its clinical context."  (<u>Id.</u>)

2005

On February 17, 2005 plaintiff reported increasing headaches for the past two months despite stopping the Percocet two weeks prior.  Plaintiff had an MRI of his head on March 8, 2005, which showed no significant abnormalities.  Dr. Metts notes, on March 8, 2005, that the MRI was normal, but plaintiff continues to have headaches.  Plaintiff was prescribed Elavil.

2006

On August 15, 2006, plaintiff was seen for physical therapy and was fitted with and issued a back brace.

On October 24, 2006, plaintiff saw Dr. Metts for his low back pain.  Dr. Metts notes that plaintiff is going to physical therapy, which is helping some.  Plaintiff's medications included ibuprofen and methocarbamol.  Dr. Metts also noted that plaintiff's back pain is controlled, and continued his methocarbamol and ibuprofen, but noted a change to oxycodone.


                    Examining Physician Reports:

On October 25, 2000, plaintiff underwent a neurological evaluation by Dr. Gupta at Edington Medical Group.  This examination was related to plaintiff's worker's compensation claim for an injury he received to his right forearm.  Dr. Gupta found plaintiff has hypersensitivity in the distal third of his forearm with numbness in the upper part and also in the dorsum of the hand involving his right hand, index finger and adjoining hand area.  Dr. Gupta noted that plaintiff's "[n]erve conduction studies showed involvement of the right antebrachial cutaneous nerve and probable right sided carpal tunnel syndrome."  (CAR at 229).  Dr. Gupta diagnosed plaintiff with an injury to the antebrachial cutaneous nerve, possible injury to the superficial branch of the radial nerve and causalgia due to the soft tissue as well as nerve injury. In terms of disability, Dr. Gupta noted plaintiff has constant slight right forearm and hand pain, intermittently becoming moderate with activities requiring heavy lifting, repetitive gripping,

repetitive torquing, repetitive pronation and supination, and repetitive fine manipulation movements. Plaintiff was also noted to have numbness in the dorsum of his hand and forearm, hypersensitivity in the lower part of his forearm, and decreased grip strength on the right. Dr. Gupta opined a permanent partial disability, with a loss of approximately 50% of his capacity for activities requiring strength and fine manipulations. Dr. Gupta also found that plaintiff's job duties were not congenial to his disability, and that plaintiff would require a modified position or vocational rehabilitation.

On October 25, 2004, plaintiff was examined by Dr. Bermudez. Plaintiff reported constant low back pain, with pain shooting into the right leg to the foot. He indicated his back "goes out at random." He reported difficulty lifting over 15 pounds, increased pain with prolonged standing, sitting, driving, squatting, bowel movements, twisting and walking. His ability to sit is limited from between 10 minutes to 2 hours. Standing for more than five to ten minutes causes increased pain. He described hypersensitivity through the right forearm and numbness in his right hand, as well as difficulty with fine manipulation. His medications were listed as Vicodin, Motrin and Methocarbamol. Plaintiff reported he was sometimes able to do household chores, depending on how he was feeling.

Dr. Bermudez's examination revealed plaintiff was in no acute distress and was able to move on and off the exam table without difficulty. Dr. Bermudez noted plaintiff was sitting in a chair when she entered the exam room, and he remained sitting during the history taking. An examination of plaintiff's upper extremities revealed hypersensitivity to palpation over the medial forearm from the region of plaintiff's scar down to about his mid forearm. His sensation was decreased to pinwheel over his thumb, index, and long fingers and over the back of the fingers as well. Plaintiff's strength was 4/5 in both upper extremities with some giving away. However, plaintiff's effort was "inconsistent with the muscle bulk noted." (CAR at 302). His grip strength was 51/60 pounds on the right at 110/105 pounds on the left. Phalen's, Tinel's and Adson's were all negative.

On examination of his cervical spine, plaintiff had no tenderness to palpation, and no spasm or trigger points were appreciated.  He had no pain with the range of motion of his neck.  Inspection of plaintiff's thoracic and lumbar spine was unremarkable, except noting good muscle bulk.  Plaintiff had tenderness to palpation over the lower lumbar paraspinal muscles, but none was noted over the SI joints, sciatic notches, or trochanters.  Plaintiff's range of motion was performed slowly and with hesitation.  He reported he was unable to extend at all.  He reported increased back pain with flexion, side bending, and rotation of the spine.  His range of motion on the right was: flexion at 90 degrees, rotation at 30 degrees, extension at 30 degrees and side pending at 30 degrees.  On the left it was: rotation at 30 degrees and side bending at 30 degrees.

Plaintiff's lower extremities showed no tenderness to palpation, and normal range of motion.  His motor strength was 4/5 in both lower extremities with giving away and effort which did not appear consistent with muscle bulk.  Plaintiff's sensation was decreased over the right leg in general as compared to the left.  His straight leg raise was 30 degrees on the right with increased back pain and 40 degrees on the left, also with increased back pain.  His sitting straight leg raises with either leg was impaired and he could not extend either leg fully due to back pain.  He was able to walk, initially favoring the right leg, but that quickly cleared up and his gait was symmetric but slow.  He was able to stand on his toes, but stated he could not stand on his heels due to back pain.  He was able to perform a half squat.

Dr. Bermudez's impressions were chronic back pain with intermittent referred pain into the right leg and status post right forearm laceration with hypersensitive over the right forearm and impaired grip strength.  Dr. Bermudez found:

> Mr. Kilgore's medical records were remarkable for x-rays of the lumbar spine showing mild degenerative disc disease at L4-5, L5-S1.  There is no report of an MRI scan on the record.  Hence, the objective studies do not confirm the alleged degree of impairment.  Mr. Kilgore also exhibits pain behavior that makes it somewhat difficult to determine his true functional level.  However, he does have good muscle bulk in the arms and legs without any signs of atrophy.  His pattern of sensory loss was non dermatomal in the leg.  He does report having very limited range of motion of the

back while standing, but this was incompatible with his ability to sit on the table.  I also find it interesting that he has never had any therapy, nor does he wish to.  I did ask him why he did not want therapy, and he indicated that he did not think it would help him at this point, even though he has never tried it.  He also has never had any treatment with injections or vocational rehab.  He states he was advised he had a surgical lesion, but I cannot confirm this with the documentation I was given.  Based on the information I have, I believe he should have restrictions limiting lifting to 35 pounds occasionally, 15 frequently.  I would limit bending and squatting to occasional.  I would not put restrictions on his ability to reach, handle, finger, and feel.  I would not limit his ability to operate foot controls.  I would restrict his [ability to] stand or walk to 6 hours intermittently in an 8 hour day and sitting to 7 hours intermittently in an 8 hour day.  He can see, hear, speak, interact appropriately with the public, and handle his own funds.

(CAR at 304-05).

                    Consulting Physician Reports:

Plaintiff had a residual physical functional capacity assessment ("RFC") on December 3, 2002.  The RFC included the following exertional limitations: occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk about 6 hours in an 8-hour work day; and an unlimited push and/or pull capability, except as limited by his lift/carry ability.  His postural limitations included the ability to frequently balance, and occasionally climb, stoop, kneel, and crouch.  There were no manipulative, visual, communicative, or environmental limitations noted.[2]

On December 4, 2002, plaintiff had a psychiatric review of his file from February 27, 2001 to December 4, 2002.  Dr. LeBray, a DDS psychologist, found plaintiff suffered from ADHD, inattentive type, but that the impairment was not severe.

Plaintiff had another psychiatric review of his file on November 23, 2004.  Dr. Harrison found insufficient evidence for any medical disposition for January 26, 2001 to

---

[2]      The court notes that there is supposed to be a narrative attached to this RFC indicating why the conclusions were different from plaintiff's treating physician and how they were not supported by the evidence in the file.  However, no narrative was attached.

1   December 30, 2003.

2          Another RFC was also completed on January 11, 2005.  This RFC noted plaintiff

3   had the ability to occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or

4   walk about 6 hours in an 8-hour workday, and his ability to push and/or pull was unlimited, other

5   than as limited for lifting/carrying.  Dr. Miller noted plaintiff's history of low back disease with

6   disc injury, tender low back, stable gait, negative straight leg raises and decreased sensory.  Dr.

7   Miller also noted plaintiff's injured right forearm, but his grip strengths were equal, and

8   ambulatory.  Plaintiff's postural limitations were noted as frequently climbing, balancing,

9   kneeling and crawling, and occasionally stooping and crouching.  Dr. Miller found "no

10   manipulative limits, under the exertional limits of light."  (CAR at 314).  Plaintiff had no visual,

11   communicative, or environmental limitations.  Dr. Miller notes no treating or examining source

12   statement regarding plaintiff's physical capacities were in the file.  Dr. Miller would limit

13   plaintiff's RFC to light.

14                                   **III.  STANDARD OF REVIEW**

15          The court reviews the Commissioner's final decision to determine whether it is:

16   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

17   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

18   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

19   (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

20   support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

21   including both the evidence that supports and detracts from the Commissioner's conclusion, must

22   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

23   v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

24   decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

25   Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

26   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

1    Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

2    Therefore, where the evidence is susceptible to more than one rational interpretation, one of

3    which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

4    Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

5    standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

6    Cir. 1988).

7                              **IV.  DISCUSSION**

8              In his motion for summary judgment, plaintiff argues that the ALJ erred in three

9    ways in determining that he was not disabled.  Specifically, plaintiff argues: (1) the ALJ

10   improperly rejected the diagnosis of his treating physician; (2) the ALJ failed to credit plaintiff's

11   testimony as to the nature and extent of his pain and functional limitations; and (3) the ALJ failed

12   to find plaintiff suffers from headaches and ADHD.

13        **A.        Treating Physician Opinion**

14             The weight given to medical opinions depends in part on whether they are

15   proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

16   821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

17   professional, who has a greater opportunity to know and observe the patient as an individual,

18   than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

19   (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

20   to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

21   (9th Cir. 1990).

22             In addition to considering its source, to evaluate whether the Commissioner

23   properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

24   in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

25   uncontradicted opinion of a treating or examining medical professional only for "clear and

26   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

                                        16

1    While a treating professional's opinion generally is accorded superior weight, if it is contradicted

2    by an examining professional's opinion which is supported by different independent clinical

3    findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

4    1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

5    rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

6    81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

7    the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

8    finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

9    legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

10   professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

11   without other evidence, is insufficient to reject the opinion of a treating or examining

12   professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

13   conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

14   1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

15   see also Magallanes, 881 F.2d at 751.

16            Plaintiff claims that his

17            treating physician provided limitations regarding standing walking
              and lifting (TR 273-274).  In fact the treating physician states that
18            the claimant would be unable to perform the light work as
              described by the Commissioner's findings (TR 274).  The Court
19            deals with other issues, but fails to address these specific
              limitations found in the record.  Since the ALJ fails to meet with
20            legal burden required to dismiss the treating physicians
              determinations, this should be remanded.
21   (Plaintiff's Motion at 10).

22            As stated above, if a treating physician's opinion is contradicted by an examining

23   physician's opinion, the Commissioner may resolve the conflict.  That is exactly the case here.

24   The ALJ found the examining physicians' findings, which were supported by independent

25   clinical findings, compelling.  The ALJ specifically notes Dr. Bermudez's findings that plaintiff's

26   complaints and abilities exhibited during the examination were inconsistent.  She also found

17

1   plaintiff's x-rays showed only mild degenerative disc disease, he had no atrophy, and no range of

2   motion deficits.  The ALJ relies on Dr. Bermudez's report, and specifically found the reports

3   from the Veteran's Administration at odds with her report, which was more thorough and took

4   into consideration plaintiff's "chronic back pain, mild lumbar x-ray results and right forearm

5   laceration."  (CAR at 18.)  He also notes Dr. Bermudez's findings that plaintiff "had good

6   muscle bulk in his arms and legs, absence of any atrophy and his pattern of sensory loss which

7   was non dermatomal in the leg."  (Id.)  The ALJ was well within his discretion to resolve any

8   conflict between treating and examining professional opinions.  The court finds no error.

9         **B.**    **Plaintiff's Credibility**

10       The Commissioner determines whether a disability applicant is credible, and the

11  court defers to the Commissioner's discretion if the Commissioner used the proper process and

12  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

13  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

14  F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

15  821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

16  and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

17  evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

18  credible must be "clear and convincing."  See id.

19       If there is objective medical evidence of an underlying impairment, the

20  Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

21  because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

22  341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

23  the symptoms alleged, including aggravating factors, medication, treatment, and functional

24  restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1)

25  the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

26  testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

1    prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

2    physician and third-party testimony about the nature, severity, and effect of symptoms.  See

3    Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

4            Plaintiff argues that the ALJ improperly discredited his testimony and failed to

5    make "specific findings stating clear and convincing reasons for doing so."  (Plaintiff's Motion at

6    11-12).  Specifically, plaintiff takes issue with the ALJ's findings that there was no evidence of

7    spinal pathology, and that plaintiff was not under the care of a physician for pain or chiropractic

8    care.  He argues that the ALJ was incorrect in finding no evidence of spinal pathology, "[t]here is

9    extensive medical evidence of continuing treatment for pain [in the] VA records and the records

10   from Oregon, which belie the incredible statement from the Commissioner."  He also argues that

11   the finding of no chiropractic care is "unsupported by the medical evidence, as there are

12   chiropractic care referenced in the records and treatment at a Chiropractic Clinic (TR 240-243)."

13   (Plaintiff's Motion at 12).  He also argues that the "Commissioner's attempt to devalue the

14   credibility are based upon assertions that are absent from the record.  The Commissioner's action

15   is unreasonable given the testimony of the claimant about his difficulties [sic] and the medical

16   evidence."  (Plaintiff's Motion at 12).

17           The ALJ concluded plaintiff's "complaints are out of proportion to the overall

18   weight of the objective medical evidence of record and other factors of non-medical nature and

19   therefore, render[ed] his testimony not substantially credible."  (CAR at 16).  The ALJ supported

20   this conclusion by finding plaintiff did not have

21           any evidence of significant degenerative spinal pathology or soft
             tissue injury involving an upper extremity, has not had

22           substantially abnormal objective clinical findings of a
             musculoskeletal impairment, has not been prescribed assistive

23           devices for ambulation, is not presently under the care of a treating
             physician for his pain, has not had any physical or chiropractic

24           therapy, is able to move about and get around without much
             difficulty, has gone through considerable periods of time without

25           any medical care for his pain, and has been performing wide
             ranging activities of daily living.

26   (CAR at 16).

1          The ALJ found this was consistent with both consultative medical evaluations,

2   wherein both consulting physicians found plaintiff's pain would not preclude him from

3   completing a full workday or workweek, while recognizing he had some limitations.  The ALJ

4   further found plaintiff's pain complaints

5              also at odds with his daily living activities which include, getting
            his son ready for pre-school each day, transporting his son to and
6            from school, making lunch, grocery shopping, socializing with his
            girlfriend, maintaining many of his personal care tasks, vacuuming
7            the carpets and doing the laundry when he is able to and paying
            bills.
8   (CAR at 17).

9          A review of the file, as indicated above, shows plaintiff was seen on a fairly

10  regular basis in 2000 and 2002 for his back pain and ADHD.  However, the records indicate

11  plaintiff was only seen twice in 2001, three times in 2003, and twice each in 2004, 2005, and

12  2006.  Therefore, the ALJ's specific finding that plaintiff had periods of time without medical

13  care is supported by the record.  The ALJ's opinion was rendered in April 2006, the

14  administrative hearing having been held in October 2005.  At the time of the hearing, plaintiff's

15  last significant medical visit had been in April 2003, with Dr. Dattilo who renewed his

16  prescriptions.  However, Dr. Dattilo's examination found negative straight leg raises, no muscle

17  wasting, and plaintiff's ability to move easily up and down off the examination table.  Dr. Dattilo

18  noted no evidence of complete inability to pursue employment.  Plaintiff was then not seen again

19  until November 2004 for a refill of his prescription and a flare up of his back pain, which he

20  rated at 4 to 6.  Plaintiff then had an MRI in December 2004, which showed mild to moderate

21  disc bulges.  Then in February 2005, plaintiff was seen for headaches, for which he had an MRI

22  that was normal.  All told, plaintiff had been seen by his "treating physicians" four times in the

23  three years preceding the opinion.  He also saw a chiropractor only twice, once in 2000 to rate his

24  back injuries and then once in 2002 for treatment.  Therefore, the ALJ's specific finding that

25  plaintiff was "not presently under the care of a treating physician for his pain, has not had any

26  physical or chiropractic therapy" is supported by the record.  Plaintiff may have seen a

1  chiropractor a few times over the years, but there is no evidence he was receiving any on-going

2  therapy.

3          The court finds the ALJ's reasons for discrediting his testimony were clear and

4  convincing.  Since the ALJ used the proper process and provided proper reasons, the court defers

5  to the ALJ's discretion.

6  **C.      Plaintiff's Impairments**

7          In order to be entitled to benefits, the plaintiff must have an impairment severe

8  enough to significantly limit the physical or mental ability to do basic work activities.  See 20

9  C.F.R. §§ 404.1520(c), 416.920(c).[3]   In determining whether a claimant's alleged impairment is

10 sufficiently severe to limit the ability to work, the Commissioner must consider the combined

11 effect of all impairments on the ability to function, without regard to whether each impairment

12 alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir.

13 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment,

14 or combination of impairments, can only be found to be non-severe if the evidence establishes a

15 slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

16 Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

17 1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

18 impairment by providing medical evidence consisting of signs, symptoms, and laboratory

19 findings.  See 20 C.F.R. §§ 404.1508, 416.908.  The plaintiff's own statement of symptoms alone

20 is insufficient.  See id.  "The mere existence of an impairment is insufficient proof of a disability.

21 "  Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993).  The burden is on the plaintiff to prove

22 that an impairment is disabling.  See id. (citing Miller v. Heckler, 770 F.2d 845, 848 (9th Cir.

23

---

24          [3]      Basic work activities include: (1) walking, standing, sitting, lifting, pushing,
   pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding,
25 carrying out, and remembering simple instructions; (4) use of judgment; (5) responding
   appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes
26 in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1     1985).  Plaintiff has failed to meet his burden.

2            Plaintiff claims the ALJ erred in finding no evidence that he suffers from

3     headaches and failed to address his ADHD.  He argues that he specifically testified about his

4     headaches and that he is prescribed Amitriptyline for them.  He also argues that he testified to his

5     ADHD and has received medical treatment for his condition.  He claims the ALJ's failure to

6     address this impairment renders his decision incomplete.

7            A review of plaintiff's medical records indicates he only sought treatment for

8     headaches twice, on November 8, 2002 and February 17, 2005.  In November 2002, plaintiff

9     reported the Vicodin was causing him headaches, and his prescription was changed to Percocet.

10     Then in February 2005, plaintiff specifically sought treatment regarding headaches, for which he

11     had an MRI.  However, the MRI found no significant abnormalities.  In addition, plaintiff

12     testified that the medication he is takes for his headache works.  (CAR at 59).  Plaintiff fails to

13     point to any other medical evidence supporting his testimony regarding headaches.  Therefore,

14     the court finds no error in the ALJ's finding that plaintiff's headaches were deemed non-severe.[4]

15            As to plaintiff's contention that the ALJ erred in failing to address plaintiff's

16     ADHD, the court finds no error.  First, the court notes that in his application material, plaintiff

17     claimed his disability consists of a combination of degenerative disc disease, right forearm

18     laceration and nerve damage, and pain.  There is no claim that he has any impairment due to his

19     ADHD diagnosis.  Second, the court notes that while there are medical records supporting

20     plaintiff's contention that he suffers from ADHD, there is no evidence that this impairment is

21     severe or limits plaintiff in any way.  In fact, all of the examining and non-examining consulting

22     professionals found no non-exertional limitations.  Specifically, Dr. LeBray, who conducted a

23     psychiatric file review, found plaintiff's ADHD was not severe.  Furthermore, none of plaintiff's

24

25         [4]     Plaintiff takes issue with the ALJ's classification of plaintiff's headaches as migraine headaches.  However, as the court agrees that there is no evidence to support plaintiff's contention that his headaches are a severe condition, it make no difference whether they are

26     migraine or otherwise.

1  treating physicians opined plaintiff was limited in any manner because of his ADHD, and he only

2  sought medical treatment for his ADHD in order to continue on the medication.  The records do

3  not indicate that any symptoms plaintiff may have from his ADHD were not controlled with his

4  medication, and there does not appear to be any adverse effect from the medication.

5        A medical condition may enter into a multiple impairment analysis, but only by

6  dint of its impact on plaintiff 's other conditions.  See e.g., Celaya v. Halter, 332 F.3d 1177, 1181

7  n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to

8  consider a condition such as plaintiff's ADHD in a multiple impairment analysis, but only where

9  it is clear from the record that plaintiff's ADHD could exacerbate his other conditions.  See e.g.,

10  Celaya, 332 F.3d at 1182, Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) .  Where a

11  multiple impairment analysis is not required, the ALJ properly considers the condition by

12  acknowledging the existence of it in making determinations throughout the sequential analysis.

13  See e.g., Burch, 400 F.3d at 684.

14        Here, the ALJ acknowledged plaintiff's ADHD.  That acknowledgment was

15  sufficient to fulfil the ALJ's duty to develop the record.  Plaintiff failed to meet his burden of

16  proof that his ADHD was a severe impairment with more than a minimal effect on his ability to

17  work.   The court finds no error.

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26   / / /

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.    Plaintiff's motion for summary judgment is denied;

2.    Defendant's cross-motion for summary judgment is granted; and

3.    The Clerk of the Court is directed to enter judgment and close this file.


DATED: September 4, 2008

                                          _____
                                          **CRAIG M. KELLISON**
                                          UNITED STATES MAGISTRATE JUDGE